**COMMUNITY ADVOCATES FOR JUST AND MORAL GOVERNANCE**
GENEVIÉVE JONES-WRIGHT, Esq., LL.M. (SBN: 235168)
6549 Mission Gorge Road, Suite 379
San Diego, CA 92120
Telephone: (619) 736-0179
Email: director@moralgovernance.org

**KYLEE BELANGER LAW CORPORATION**
KYLEE BELANGER, Esq. (SBN: 294992)
5663 Balboa Ave. #376
San Diego, CA 92111
Telephone: (619) 937-3423
Email: kylee@kblawcorp.com

**ATTORNEYS FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILY LUCAS,<br><br>               Plaintiff,<br><br>       v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA, COUNTY OF SAN DIEGO, and DOES 1-100,<br><br>               Defendants. | CASE NO. **'26 CV 2774 DMS DEB**<br><br>COMPLAINT FOR:<br><br>(1)   42 USC §1983: Violation of First Amendment<br><br>(2)   42 USC §1983: Violation of Fourth Amendment - Unlawful Arrest and Seizure, Excessive Force<br><br>(3)   42 USC §1983: Violation of Fifth Amendment - Self-Incrimination<br><br>(4)   42 USC §1983: Violation of Fourteenth Amendment – Procedural Due Process<br><br>(5)   42 USC §1983: Violation of Fourteenth Amendment – Denial of Medical Care<br><br>(6)   42 USC §1983: *Monell* – Medical Care<br><br>(7)   42 USC §1983: Violation of Fourteenth |

1

**COMPLAINT**

Amendment – Conditions of Confinement

(8)  42 USC §1983: *Monell* - Conditions of Confinement

(9)  Violation of California Civil Code § 52.1 (Bane Act)

(10) Intentional Infliction of Emotional Distress

DEMAND FOR JURY TRIAL

Plaintiff Emily Lucas alleges and complains as follows:

## I.
## JURISDICTION AND VENUE

1.  Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§1331 (federal question) and 42 U.S.C. §1983.

2.  This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. §1367(a).

3.  Pursuant to 28 U.S.C. §1391(b)(1) and (2), venue is proper in the Southern District of California.

## II.
## PARTIES

4.  Plaintiff EMILY LUCAS is an individual residing in the County of San Diego in the State of California.

5.  Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA is a governmental entity that operates public universities that are part of the University of California ("UC") system, including University of California San Diego (UCSD).

6.  Defendant COUNTY OF SAN DIEGO is and was, at all times relevant to this complaint, a municipal entity duly organized under California law. The San Diego County Sheriff's Department ("Sheriff's Department") is the chief law enforcement agency for the County. The Sheriff's Department manages and operates the San Diego Central Jail ("Central Jail") and Las Colinas Detention Facility ("Las Colinas") and was, at all times relevant to this complaint, responsible for the policies, procedures,

2

**COMPLAINT**

practices, and customs of the Central Jail and Las Colinas, as well as for the hiring, training, supervision, discipline, actions, and inactions of the County's agents and/or employees working in the Central Jail and Las Colinas.

7. Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and on that basis alleges, that the DOE Defendants include: (a) **DOE OFFICERS (DOES 1–30)**, consisting of sworn law enforcement officers employed by UCSD Police Department, the California Highway Patrol, and/or other agencies, who participated in the detention, arrest, seizure of property, and use of force against Plaintiff, and also includes California Highway Patrol officers who acted under color of state law and personally participated in, directed, or failed to intervene in the violations alleged herein. (b) **DOE SUPERVISORS (DOES 31–50)**, consisting of supervisory law enforcement personnel who directed, authorized, or ratified the enforcement operation, including decisions to arrest individuals without individualized probable cause; (c) **DOE JAIL PERSONNEL (DOES 51–75)**, consisting of custody staff, deputies, and medical personnel employed by the County of San Diego who were responsible for Plaintiff's care, intake, supervision, and medical treatment while detained; and (d) **DOE UCSD OFFICIALS (DOES 76–100)**, consisting of UCSD administrators, investigators, hearing officers, and disciplinary decisionmakers who participated in the investigation, adjudication, and imposition of discipline against Plaintiff. Each DOE Defendant acted under color of state law and within the course and scope of their employment, and each personally participated in, directed, or failed to prevent the violations alleged herein.

8. Plaintiff further reserves the right to amend this Complaint to assert additional claims based on policies, practices, or customs upon identification of responsible decisionmakers.

## III.

## FACTS

### A. Non-Participant At Campus Demonstration

9. Plaintiff is a young woman who attended UCSD as a graduate student. Plaintiff was attending classes to pursue a Master's Degree in Marine Biology from September 2021 to March 2023. Following her coursework, Plaintiff worked on her Master's thesis until her thesis defense on May 20, 2024.

3

COMPLAINT

Plaintiff did not receive her diploma until March 2025.

10. Plaintiff takes Metformin, a common medication for diabetes, daily to assist with Polycystic Ovary Syndrome, which can cause Reactive Hypoglycemia to Plaintiff.

11. Plaintiff was previously certified as a Wilderness First Responder, and has received extensive Wilderness First Aid training. Plaintiff became certified as a Wilderness First Responder in 2018. Following her training, Plaintiff volunteered as a medic during street protests in Boston from May 2020 to August 2021.

12. Plaintiff views her role in providing medical care to those in need, including at demonstrations, as a calling informed by her deeply held beliefs.

13. On or about March 2024, Plaintiff began volunteering as a medic at various "Free Palestine" protests in San Diego. Plaintiff thereafter became connected with a network of street medics who provide medical assistance at demonstrations throughout San Diego.

14. On or about May 1, 2024, UCSD students began a demonstration against the Israel-Palestine war. The protesters favored the Palestinians. The demonstration was an encampment that took place on Library Walk across from the Price Center – a central location of the UCSD campus. The encampment was an immobile, 24/7 presence which slowly grew as the demonstration continued.

15. In the days preceding the demonstration, Plaintiff was alerted that the demonstration was about to take place by the network of street medics.

16. Plaintiff was present at the encampment on multiple occasions prior to May 6, 2024 solely to provide medical assistance. She did not remain overnight and did not participate in protest activity.

17. While present, Plaintiff remained at or near a designated medic area and was identifiable as a medic by her red backpack and a red cross marking across her chest. She carried medical supplies and equipment in her backpack consisting of gauze and bandaids of different sizes, tourniquet, eye wash (saline), medical gloves, athletic tape, chest seal, trauma shears, ice packs, heat packs, emergency blankets, antibiotic ointment, burn cream, some OTC meds like advil and benadryl, water, gas mask, helmet, and various other medical items.

18. Plaintiff did not demonstrate or express any views regarding the Israel-Palestine war while on duty as a medic. Plaintiff was always clearly marked by a red backpack and red cross duct taped to her chest.

4

---

**COMPLAINT**

19. Aside from the final day, Plaintiff's "shifts" lasted between four and eight hours. Plaintiff would spend her "shifts" nearly exclusively at the "medic" table that had been set up by demonstrators.

20. On May 6, 2024, on or about 5:30AM, Plaintiff was alerted by the network of street medics that law enforcement was at the encampment and that medics were needed.

21. Beginning at 5:20am, law enforcement made four dispersal orders five minutes apart. Plaintiff arrived sometime between 6:10 am and 7:02 am after dispersal orders had already been given at the encampment.

22. At that time, law enforcement maintained an active perimeter around the encampment and controlled access to the area through lines of officers.

23. Upon arrival, Plaintiff witnessed armored members of the UCSD police force, assisted by armored members of the California Highway Patrol, encircle the encampment, with a line of riot police standing on Library Walk facing the encampment.

24. Plaintiff walked through the Price Center, then through the line of riot police on Library Walk to enter the encampment.

25. As Plaintiff was walking through the line of riot police, Plaintiff announced herself as a medic to the line of riot officers by saying "I'm here as a medic, I'm headed to the encampment." The riot police permitted Plaintiff to pass.

26. Plaintiff reasonably understood from law enforcement's conduct that she was permitted to enter and remain in the encampment area in her capacity as a medic.

27. At all times, Plaintiff's conduct was consistent with that of a non-threatening medical provider, and she took steps to ensure that law enforcement could observe that she was not engaged in protest activity.

28. Plaintiff went directly to the designated medical table to perform her duties as a medic. Plaintiff was clearly marked as before, and was not participating in the demonstration.

29. Plaintiff noticed that the back of the encampment also had a line of riot police which was close to the medic table. Concerned for her safety, and to demonstrate that she was not a threat to law enforcement, Plaintiff narrated her actions and kept her hands as visible as possible.

30. Within ten minutes of Plaintiff arriving at the medic table, the back line of riot police began to move in to the encampment, arresting demonstrators and destroying the encampment as they went.

5

**COMPLAINT**

31. Plaintiff did not receive any warning that law enforcement was going to begin using force. Plaintiff was not warned that she was engaging in unlawful assembly.

32. Plaintiff was not given any instruction, after entering the encampment, directing her in her capacity as a medic to leave the area.

33. When the officers arrived at the medic table, they began to destroy it, which forced Plaintiff to step back to the center of the encampment.

## B. Plaintiff's Unlawful Arrest and Seizure

34. Members of law enforcement approached Plaintiff and demanded that she put her hands behind her back. Plaintiff immediately complied and was arrested.

35. Again, Plaintiff informed the arresting officers that she was there as a medic, and was not a part of the demonstration. The arresting officers told Plaintiff they did not care.

36. Plaintiff was arrested as part of a broader enforcement action in which individuals present in the encampment area, including those not engaged in protest activity, were taken into custody. Law enforcement did not conduct any individualized assessment of Plaintiff's conduct prior to arresting her and instead arrested her based solely on her presence in the encampment area.

37. During the arrest, the arresting officers took Plaintiff's backpack, which included medical Equipment and supplies and her car keys. Plaintiff never recovered these items.

38. The items seized included Plaintiff's medical equipment necessary for providing aid and personal belongings and medications essential for her daily health needs.

39. Although Plaintiff did not resist arrest in any way, the arresting officers had zip-tied Plaintiff's hands so tightly that it cut off blood flow. It took approximately two hours before Plaintiff was able to get the attention of a police officer willing to cut them off, by which point Plaintiff's hands were red and swollen from lack of blood flow. The officer was unable to fit scissors underneath the zip ties to remove them, and had to saw them off with a knife, cutting Plaintiff's hand in the process. For several days after the arrest, Plaintiff had numbness, tingling, and pain in her hands caused by the too tight zip ties.

40. The use of excessively tight restraints occurred despite Plaintiff's full compliance and lack of resistance. The force used in restraining Plaintiff was unnecessary under the circumstances and excessive given that Plaintiff was compliant, non-threatening, and did not resist arrest.

41. Plaintiff requested relief from the restraints, but officers failed to respond for an extended period

6

---

of time despite her visible distress.

42. Plaintiff and the demonstrator arrestees were taken via a series of buses, first to the men's jail. Upon arrival at the men's jail, Plaintiff requested her medication, Metformin, from the deputy sheriff on the bus. The deputy sheriff told Plaintiff that she would get a medical intake interview when she arrived at Las Colinas, the women's jail.

### C. Denial of Medical Care and Inhumane Conditions in the Jail

43. At all relevant times, jail personnel were aware that Plaintiff required prescribed medication and had access to that medication. Plaintiff's prescribed medication was required for daily use, and the failure to provide that medication created a substantial risk of serious harm to Plaintiff's health.

44. Eventually, about an hour later, deputies took Plaintiff, together with the female demonstrators, to Las Colinas.

45. During the initial intake process at Las Colinas, jail officials gave Plaintiff what they said was a pregnancy test. Plaintiff thought this was suspicious as they also used the same test on trans women, who cannot get pregnant. During Plaintiff's medical interview, the official who conducted the interview said that Plaintiff had tested negative for drugs.

46. During her detention of more than 13 hours, Plaintiff was confined in close quarters with other detainees and exposed to shared spaces and conditions that increased the risk of communicable disease.

47. Plaintiff would not have been exposed to these conditions but for her warrantless arrest and detention.

48. Plaintiff demanded her Metformin, and the unnamed official confirmed that they had access to Plaintiff's prescription and would give her the medication shortly. For the next approximately ten hours, Plaintiff continued to ask for Metformin, only to be repeatedly put off and eventually denied outright without explanation.

49. By the time Plaintiff and the demonstrators were starting to be released, Plaintiff was so sick that she was lying on a table, face down. Plaintiff's condition was visibly apparent to both jail officials and other detainees.

50. Another unnamed official then pricked Plaintiff's finger and took her blood without warning. The official then gave her a jelly packet to eat. Plaintiff knew that the jelly packet would worsen her symptoms, and did not eat the packet.

7

---

**COMPLAINT**

51. Despite Plaintiff's visible medical distress and repeated requests for assistance, jail officials failed to provide timely care. The demonstrators began to beg the jail officials to release Plaintiff first as she was clearly ill and needed her medication.  Despite, and perhaps because of, these pleas, Plaintiff was one of the last people released.

52. Sheriff deputies knew or should have known that delaying or denying Plaintiff's medication would cause harm and nevertheless failed to take reasonable steps to provide necessary medical care.

53. Plaintiff was sick for several days afterwards.

54. Within a few weeks, Plaintiff began to show symptoms of worsening liver problems, including yellow diarrhea, yellow vomit, nausea and difficulty eating.  These symptoms persisted for months.

55. On August 9, 2024, Plaintiff felt that her symptoms had become so severe that she had to go to the hospital, where she was admitted for potential liver problems.

56. Plaintiff was then subjected to a series of tests, and Plaintiff's physicians determined that Plaintiff had contracted Hepatitis A.

57. Plaintiff is informed and believes that she contracted Hepatitis A at the Las Colinas Detention Facility.

58. Plaintiff was particularly susceptible to the dangers of Hepatitis A as she has Nonalcoholic Fatty Liver Disease.

59. Plaintiff was sick with Hepatitis A until approximately September of 2024 and continues to suffer harm as it has had lasting impacts on her liver.

### D.   UCSD Disciplinary Proceedings

60. Plaintiff's ordeal did not end with her release from jail and the subsequent health effects; she also suffered months of targeted harassment by the UCSD administration.

61. The disciplinary process imposed by UCSD was adversarial in nature and carried significant consequences affecting Plaintiff's academic standing, professional opportunities, receipt of her diploma, damage to her professional reputation, and interference with her ability to obtain employment.

62. UCSD charged Plaintiff with violations of: (a) SCP 4(c) (Violating Other University Policies)/Policy on Speech, Advocacy and Distribution of Literature on University Grounds (PPM 510-1 IX & XII); (b) PACAOS 102.13 (Disruption of University Activities) - Obstruction or disruption of teaching, research, administration, disciplinary procedures, or other University activities; (c) PACAOS

8

---

**COMPLAINT**

102.15 (Disturbance of the Peace/Unlawful Assembly) - Participation in a disturbance of the peace or unlawful assembly; and (d) PACAOS 102.16 (Failure to Comply/Obstruction) - Failure to identify oneself to, or comply with the directions of, a University official or other public official acting in the performance of his or her duties while on University property or at official University functions; or resisting or obstructing such University or other public officials in the performance of or the attempt to perform their duties.

63. On or about September 2024, Plaintiff was initially questioned by a member of the UCSD administration, and was not read her Miranda rights before the questioning.

64. Plaintiff reasonably understood that she was required to participate in this questioning and that failure to do so could result in additional disciplinary consequences.

65. On October 4, 2024, Plaintiff was subjected to a recorded, quasi-criminal "trial" in which a police officer was present and testified against her.  Plaintiff was not informed of her rights under criminal law by UCSD prior to the hearing.

66. The presence and participation of a law enforcement officer in the hearing contributed to the coercive and adversarial nature of the proceedings.

67. Plaintiff was allowed to have an attorney present at this proceeding but her attorney was not permitted to speak on her behalf.

68. Plaintiff's inability to have counsel speak or advocate on her behalf deprived her of meaningful assistance in responding to the allegations against her.

69. The procedures employed lacked fundamental safeguards typically associated with adjudicatory proceedings, including neutral decisionmakers and structured evidentiary standards. The absence of neutral decisionmakers further increased the likelihood of an erroneous outcome.

70. Plaintiff was not allowed to call specific witnesses – particularly her arresting officer.  Instead, a Lieutenant that Plaintiff had never met attended who testified as to every arrest that day – of more than 60 people. The inability to call the arresting officer deprived Plaintiff of the opportunity to present material evidence directly bearing on the justification for her arrest and her role as a medic.

71. Plaintiff was not allowed to submit specific evidence on her behalf, including letters of support and witness letters regarding her intent at the demonstration.  There did not appear to be any evidentiary "gatekeeping" process or legal function which served to keep this evidence out – it was instead

9

---

**COMPLAINT**

unilaterally decided by UCSD that Plaintiff would not be allowed to present any evidence on her behalf, outside of her own testimony. The basis stated was "their content is not within the scope of the alleged violation of the University Standards of Conduct." The exclusion of this evidence prevented Plaintiff from presenting a complete defense and increased the risk of an erroneous finding against her.

72. Hearsay evidence was admitted during the proceedings without any apparent evidentiary standard or limitation.

73. Plaintiff was not advised of her rights, and was not allowed to "plead the fifth," despite a police officer being present for her hearing. Plaintiff was required to answer questions regarding the events underlying her arrest under circumstances in which her statements could be used against her, without being advised of her right to decline to answer and despite the fact that any statements she made during the disciplinary process could be used against her in a criminal proceeding arising from the same events.

74. The "officers" in charge of the quasi-criminal hearing were not law enforcement officers, attorneys, or judges, but were instead students and administrative staff of UCSD. The "officers" subjected Plaintiff to questioning both at and outside of the hearing. These individuals were not neutral or independent adjudicators and lacked the training and authority typically associated with fair decisionmaking in proceedings carrying significant consequences.

75. The UCSD administration did not consider the unique facts of her case, particularly that she was not a participant in the demonstration, and instead subjected her to the same trial process and result as every demonstrator who was arrested on May 6, 2024.

76. In dismissal of the evidence showing Plaintiff was present solely as a medic and not as a participant in the demonstration, UCSD stated they "could not establish any affiliation with an official medical group, [so] it appears [Plaintiff was] there on their own initiative."

77. UCSD further failed to consider that Plaintiff had been permitted by law enforcement to enter the encampment after identifying herself as a medic.

78. These procedures created a substantial risk that Plaintiff would be found guilty despite the absence of reliable or individualized evidence.

79. As further punishment, UCSD withheld Plaintiff's diploma. Plaintiff was supposed to receive her diploma in June of 2024. UCSD continued to withhold Plaintiff's diploma until March 22, 2025.

80. After the two and half hour "trial," Plaintiff was found "guilty" of failure to comply and

10

**COMPLAINT**

participation in an unlawful assembly, despite there being no real evidence to support either conclusion. The findings were made despite the absence of individualized evidence demonstrating that Plaintiff engaged in unlawful conduct.

81. UCSD administration put Plaintiff on probation for a year, charged $50 for a course on "practical decision making," and assigned a 5-7 page paper about the role of medical professionals during protest. These sanctions were imposed following a process in which Plaintiff was compelled to participate under threat of additional consequences, including further discipline and continued withholding of her diploma.

82. The disciplinary findings remain part of Plaintiff's official academic record.

83. Plaintiff was not provided clear information regarding whether or how these disciplinary findings may be disclosed to third parties, including potential employers, graduate programs, or licensing bodies.

84. During the period in which Plaintiff's diploma was withheld, Plaintiff was under consideration for a professional opportunity with the United Nations for which she had been specially recommended. As part of that process, Plaintiff was required to provide proof of her degree. Plaintiff was unable to provide her diploma due to its withholding by UCSD and was required to explain that her diploma had not been released. After providing this explanation, Plaintiff did not receive further communication regarding that opportunity.

85. Plaintiff is informed and believes that the inability to provide proof of her degree negatively impacted her candidacy for that position.

86. Plaintiff has suffered, and continues to suffer, professional and economic harm as a result of the disciplinary findings and delay in receiving her diploma.

87. Following her diagnosis of Hepatitis A, Plaintiff experienced prolonged illness lasting several months, during which she was significantly limited in her ability to engage in daily activities, including seeking employment. Plaintiff continues to experience physical effects that she attributes to that illness.

88. As a result of the events described herein, Plaintiff has experienced increased anxiety, particularly in situations involving law enforcement or environments similar to those in which the events occurred.

89. Plaintiff's injuries, including reputational harm, emotional distress, and interference with professional opportunities are ongoing in nature.

11

**COMPLAINT**

**IV.**
**CAUSES OF ACTION**
**COUNT 1: 42 USC §1983: Violation of the First Amendment**
**(Freedom of Speech, Assembly, and Free Exercise of Religion)**
**(Against Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA, DOE OFFICERS and DOE SUPERVISORS)**

90. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

91. The First Amendment protects Ms. Lucas' right to be present at a public demonstration, to associate with other medics, and to provide medical services in furtherance of activity consistent with her beliefs.

92. Defendants falsely arrested Ms. Lucas in retaliation for her exercise of her First Amendment rights to act in accordance with her deeply held beliefs regarding her role in providing care to those in need and to freely associate. There was no probable cause or warrant to justify such an arrest.

93. The absence of probable cause, together with Defendants' knowledge that Plaintiff was acting as a medic and had been permitted to enter the encampment, supports a reasonable inference that Plaintiff's protected activity was a substantial or motivating factor in Defendants' decision to arrest her.

94. Defendants acted in order to impose hardship upon Plaintiff and to punish her for the exercise of her rights, including by subjecting her to arrest and detention despite her lawful presence and conduct.

95. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA further punished Plaintiff for the exercise of her First Amendment rights through the initiation and prosecution of disciplinary proceedings arising from her presence at the demonstration via a quasi-criminal "trial."

96. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA subjected Plaintiff to discipline based on her presence at and association with protected activity.

97. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA had no lawful reason to discipline Plaintiff for the lawful exercise of her rights under the First Amendment. The stated justification for Plaintiff's discipline was pretextual and served to suppress protected religious freedoms and rights to assemble and associate.

98. Defendants' actions would deter a person of ordinary firmness from engaging in protected speech, association, or providing support services at demonstrations.

12

---

**COMPLAINT**

99. Plaintiff suffered damages in an amount to be established at trial as a direct and proximate result of the illegal acts of Defendants.

### COUNT 2: 42 USC §1983: Violation of the Fourth Amendment
### (Unlawful Arrest and Seizure; Excessive Force)
### (Against DOE OFFICERS and DOE SUPERVISORS)

100.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.   Plaintiff had a clearly established right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures of her person and her property.

102.   Defendants, acting under color of state law, seized Plaintiff's person by arresting her.

103.   Defendants lacked probable cause to arrest Plaintiff. Plaintiff was compliant, non-threatening, and acting solely in her capacity as a medic. Plaintiff did not engage in any conduct constituting unlawful assembly, obstruction, or any other offense.

104.   Prior to her arrest, Plaintiff identified herself as a medic and was permitted by law enforcement to enter the encampment through a police-controlled perimeter, and Defendants knew or reasonably should have known that Plaintiff was not a participant in protest activity.

105.   Defendants did not conduct any individualized assessment of Plaintiff's conduct and instead arrested her based solely on her presence at the encampment.

106.   Under these circumstances, the arrest of Plaintiff was objectively unreasonable.

107.   Defendants, acting under color of state law, seized Plaintiff's personal property, including her medical equipment, supplies, medications, and personal belongings, during the arrest.

108.   The seizure and continued retention of Plaintiff's property were conducted without lawful justification.

109.   Defendants used excessive force in restraining Plaintiff by applying zip ties so tightly that they caused pain, swelling, restricted circulation, and injury.

110.   Plaintiff was fully compliant and did not resist arrest, and the use of such force was unnecessary under the circumstances.

111.   Defendants failed to respond to Plaintiff's requests for relief from the restraints for an extended period of time despite her visible distress.

13

---

**COMPLAINT**

112. Each of the Defendants personally participated in, directed, or failed to intervene to prevent the unlawful arrest, seizure, and use of excessive force against Plaintiff.

113. As a direct and proximate result of Defendants' unlawful arrest, seizure of property, and use of excessive force, Plaintiff suffered physical injury, emotional distress, loss of property, and other damages.

114. Plaintiff's detention and resulting injuries would not have occurred but for Defendants' unlawful conduct.

**COUNT 3: 42 USC §1983: Violation of Plaintiff's Fifth Amendment Rights**
**(Compelled Self-Incrimination)**
**(Against Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA and DOE UCSD OFFICIALS)**

115. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116. Plaintiff had a clearly established right under the Fifth Amendment to the United States Constitution not to be compelled to be a witness against herself.

117. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA subjected Plaintiff to questioning in connection with disciplinary proceedings arising from the events of May 6, 2024.

118. The questioning concerned the same underlying conduct that formed the basis of Plaintiff's arrest and potential criminal exposure.

119. Plaintiff was required to participate in the disciplinary process and reasonably believed that failure to answer questions could result in additional sanctions, including further discipline and continued withholding of her diploma.

120. Plaintiff was required to answer questions in a recorded proceeding under circumstances in which her statements could be used against her.

121. Plaintiff was not advised that she could decline to answer such questions.

122. Under these circumstances, Plaintiff's participation in the questioning was compelled. Plaintiff did not have a meaningful opportunity to refuse to answer questions without risking additional sanctions.

123. Plaintiff was not permitted to meaningfully assert her rights, including through the assistance of counsel, as her attorney was not permitted to speak or advocate on her behalf and was limited to

14

**COMPLAINT**

consulting with Plaintiff through phone calls or text messages.

124. The presence and participation of law enforcement in the proceedings contributed to the coercive nature of the questioning.

125. By compelling Plaintiff to provide statements without adequate safeguards, Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA violated Plaintiff's rights under the Fifth Amendment to the United States Constitution.

126. At the time of the disciplinary proceedings, potential criminal charges arising from the same underlying events had not been resolved and were being held in abeyance by local prosecuting authorities while the University's disciplinary process proceeded. Under these circumstances, Plaintiff reasonably understood that any statements she made during the disciplinary process could be used against her in a criminal proceeding arising from the same events.

127. The combination of pending potential criminal liability and the coercive nature of the disciplinary process created substantial pressure on Plaintiff to provide statements despite the risk of self-incrimination.

128. Plaintiff suffered damages as a direct and proximate result of the illegal acts of Defendants.

129. Plaintiff is entitled to compensatory damages, attorneys' fees pursuant to 42 U.S.C. § 1988, punitive damages, and such additional relief as the Court deems just.

**COUNT 4: 42 USC §1983: Violation of Plaintiff's Fourteenth Amendment Rights**
**(Procedural Due Process)**
**(As to Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA and DOE UCSD OFFICIALS)**

130. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

131. Plaintiff possessed protected liberty and property interests, including her academic standing, her right to receive her diploma, her reputation, and her ability to pursue employment and professional opportunities.

132. Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA deprived Plaintiff of these interests by initiating and prosecuting disciplinary proceedings that resulted in findings of misconduct, the imposition of sanctions, and the withholding of Plaintiff's diploma.

15

**COMPLAINT**

133. At the time of the disciplinary proceedings, potential criminal charges arising from the same underlying events had not been resolved and were being held in abeyance by prosecuting authorities while the University's process proceeded. As a result, Plaintiff faced the prospect that statements made during the disciplinary process could have consequences beyond the University setting.

134. The disciplinary process included formal charges, a recorded hearing, questioning regarding the events of May 6, 2024, and the participation of law enforcement personnel in the proceeding. Under these circumstances, the proceeding bore features of an adversarial adjudication in which Plaintiff's conduct was evaluated for the purpose of imposing sanctions affecting her academic and professional future.

135. Despite the seriousness of these consequences, Defendant REGENTS did not provide Plaintiff with a meaningful opportunity to be heard.

136. The adversarial, recorded nature of the proceeding, combined with the participation of law enforcement and the potential for collateral criminal consequences, heightened the need for basic procedural safeguards and underscores the fundamental unfairness of the process provided.

137. Plaintiff was not permitted to call material witnesses, including the arresting officer, whose testimony was directly relevant to the allegations against her.

138. Instead, Defendant REGENTS relied on testimony lacking firsthand knowledge and permitted the use of hearsay without any meaningful evidentiary safeguards.

139. Plaintiff was not afforded meaningful assistance of counsel, as her attorney was not permitted to speak or advocate on her behalf and was limited to consulting with Plaintiff through phone calls or text messages.

140. The individuals presiding over the proceedings were not neutral or independent decisionmakers and lacked the training and authority typically associated with fair adjudication in proceedings carrying significant consequences.

141. Defendants failed to conduct an individualized assessment of Plaintiff's conduct and instead treated her as a participant in protest activity despite evidence that she was present solely as a medic. Defendants, including DOE UCSD OFFICIALS, personally participated in, directed, or enforced the procedures described herein.

142. The procedures employed by Defendant REGENTS created a substantial risk of

16

**COMPLAINT**

erroneous deprivation of Plaintiff's protected liberty and property interests.

143. The inclusion of basic procedural safeguards, including the ability to present evidence, call witnesses, and receive meaningful assistance of counsel, would have significantly reduced the risk of an erroneous outcome.

144. As a direct and proximate result of these deficient procedures, Plaintiff was found guilty of violations, subjected to sanctions, and deprived of her diploma, resulting in harm to her academic standing, reputation, and professional opportunities.

145. By employing procedures that were fundamentally unfair and lacking in basic safeguards, Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA deprived Plaintiff of liberty and property interests without due process of law in violation of the Fourteenth Amendment. The constitutional deficiencies described herein were not isolated or incidental, but were carried out pursuant to established policies, practices, and customs governing the investigation and adjudication of student discipline within the University of California system. These policies included, among other things, restricting the role of counsel, limiting the ability to present evidence and call witnesses, permitting reliance on hearsay without meaningful safeguards, and failing to ensure neutral decisionmakers. As applied to Plaintiff, these policies created a substantial risk of erroneous deprivation and caused the violations of Plaintiff's Fourteenth Amendment rights.

146. Plaintiff suffered damages as a direct and proximate result of Defendant REGENTS' unlawful conduct.

147. Plaintiff is entitled to compensatory damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and such additional relief as the Court deems just.

**COUNT 5: 42 USC §1983: Violation of Plaintiff's Fourteenth Amendment Rights**
**(Denial of Medical Care)**
**(As to Defendant COUNTY OF SAN DIEGO and DOE JAIL PERSONNEL)**

148. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149. At all relevant times, Plaintiff was a pretrial detainee in the custody of Defendant COUNTY OF SAN DIEGO and entitled to protection under the Fourteenth Amendment.

17

**COMPLAINT**

150.    Plaintiff had a serious medical need, including the need for prescribed medication to manage her medical condition.

151.    Defendant COUNTY OF SAN DIEGO, through its agents and employees, was aware of Plaintiff's medical condition and her need for prescribed medication. Plaintiff repeatedly requested her medication and medical assistance while in custody. Despite this knowledge, Defendant COUNTY OF SAN DIEGO failed to provide Plaintiff with necessary medical care and denied her access to her prescribed medication for an extended period of time.

152.    Plaintiff's medical condition visibly deteriorated during her detention, and her distress was apparent to jail personnel and others present. Despite Plaintiff's visible medical distress and repeated requests for assistance, Defendant COUNTY OF SAN DIEGO failed to take reasonable measures to provide necessary medical care in violation of Plaintiff's rights under the Fourteenth Amendment.

153.    Despite Plaintiff's known medical condition, repeated requests for medication, and visible deterioration, Defendant COUNTY OF SAN DIEGO, through its agents and employees, failed to take reasonable available measures to eliminate that risk, even though a reasonable jail employee in the same circumstances would have appreciated the high degree of risk involved, thereby making the consequences of such conduct obvious to any reasonable person in the same circumstances.

154.    The acts and omissions of Defendant COUNTY OF SAN DIEGO were objectively unreasonable and placed Plaintiff at substantial risk of serious harm.

155. As a direct and proximate result of Defendant COUNTY OF SAN DIEGO's conduct, Plaintiff suffered physical injury, illness, and emotional distress, including symptoms requiring medical treatment following her release. Plaintiff suffered damages as a direct and proximate result of the unlawful acts of Defendant COUNTY OF SAN DIEGO.

**COUNT 6: 42 USC §1983:** *Monell* **Liability (Denial of Medical Care)**

**(As to Defendant COUNTY OF SAN DIEGO and DOE JAIL PERSONNEL)**

156.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

157.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a

18

**COMPLAINT**

deprivation under color of law of a right, privilege, or immunity secured to her by the Fourteenth Amendment to the United States Constitution.

158.    Defendant COUNTY OF SAN DIEGO, through its policymakers, was responsible for establishing, implementing, and maintaining policies, practices, and procedures governing the provision of medical care to detainees in its custody, including at Las Colinas Detention Facility.

159.    At all relevant times, Defendant COUNTY OF SAN DIEGO maintained and enforced de facto policies, practices, customs, and omissions that caused the deprivation of Plaintiff's constitutional right to adequate medical care under the Fourteenth Amendment. These policies, practices, customs, and omissions included, but were not limited to: (a) Failing to implement adequate intake and screening procedures to identify and care for detainees with known medical conditions and ensure continuity of care, including but not limited to a policy and practice that separates detainees from their daily medications while in custody; (b) Failing to implement and enforce procedures to ensure timely access to prescribed medications; (c) Permitting the denial or delay of necessary medical treatment despite knowledge of a detainee's condition; (d) Failing to ensure that detainee requests for medical care are timely reviewed and addressed; (e) Failing to adequately train, supervise, and discipline employees responsible for providing or facilitating medical care to detainees; and (f) Failing to investigate, correct, or discipline employees in response to known deficiencies in the provision of medical care.

160.    Defendant COUNTY OF SAN DIEGO knew that these policies, practices, customs, and omissions created a substantial risk that detainees would be deprived of necessary medical care.

161.    The need for adequate policies and safeguards governing the provision of medical care to detainees was obvious, particularly where detainees present with known medical conditions requiring ongoing treatment and prescribed medication.

162.    Defendant COUNTY OF SAN DIEGO was on notice that its failure to implement adequate procedures and safeguards would likely result in constitutional violations, including the denial and delay of necessary medical care.

163.    Despite this knowledge, Defendant COUNTY OF SAN DIEGO failed to take reasonable steps to correct these deficiencies, demonstrating deliberate indifference to the medical needs of detainees, including Plaintiff.

164.    The denial and delay of Plaintiff's prescribed medication and necessary medical care

19

**COMPLAINT**

were carried out pursuant to, and caused by, these policies, practices, customs, and omissions and were the moving force behind the violation of Plaintiff's constitutional rights.

165. As a direct and proximate result of Defendant COUNTY OF SAN DIEGO's conduct, Plaintiff suffered physical injury, illness, emotional distress, and other damages.

166. Plaintiff is entitled to compensatory damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and such additional relief as the Court deems just.

### COUNT 7: 42 U.S.C. § 1983 – Violation of the Fourteenth Amendment
### (Unconstitutional Conditions of Confinement)
### (Against Defendant COUNTY OF SAN DIEGO and DOE JAIL PERSONNEL)

167. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

168. At all relevant times, Plaintiff was a pretrial detainee in the custody of Defendant COUNTY OF SAN DIEGO and entitled to protection under the Fourteenth Amendment.

169. Plaintiff was confined in close quarters with other detainees in an environment that was overcrowded, unsanitary, and unsafe, and that increased the risk of transmission of communicable disease as a result of Defendant COUNTY OF SAN DIEGO's decisions with respect to the conditions of confinement in its jails, including Las Colinas Detention Facility.

170. These conditions included, but were not limited to, inadequate sanitation, lack of proper infection control measures, and exposure to individuals in close physical proximity without adequate safeguards.

171. Defendant COUNTY OF SAN DIEGO knew that such conditions created a substantial risk of serious harm to detainees, including the risk of exposure to communicable disease.

172. The unsafe and unsanitary conditions at Defendant's detention facilities have been documented in governmental reports, investigations, and other sources, placing Defendant COUNTY OF SAN DIEGO on notice of the risks posed by these conditions.

173. Despite this knowledge, Defendant COUNTY OF SAN DIEGO failed to take reasonable available measures to remedy these conditions or to protect detainees from the risks they posed.

174. A reasonable person in the same circumstances would have appreciated the high degree of risk involved, and the consequences of failing to address such conditions were obvious.

20

---

**COMPLAINT**

175. The conditions under which Plaintiff was confined were objectively unreasonable and deprived her of basic human needs, including safe and sanitary living conditions.

176.    As a direct and proximate result of these conditions, Plaintiff was exposed to a substantial risk of serious harm and suffered physical illness and injury requiring medical treatment following her release.

177.    As a direct and proximate result of Defendant COUNTY OF SAN DIEGO's conduct, Plaintiff suffered physical injury, illness, emotional distress, and other damages.

178. Plaintiff is entitled to compensatory damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and such additional relief as the Court deems just.

**COUNT 8: 42 U.S.C. § 1983 – Municipal Liability (Monell)**
**(Unconstitutional Conditions of Confinement)**
**(Against Defendant COUNTY OF SAN DIEGO and DOES)**

179.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180.    Defendant COUNTY OF SAN DIEGO, through its Sheriff and other policymakers, was responsible for establishing, implementing, and maintaining policies, practices, and procedures governing the conditions of confinement within its detention facilities, including Las Colinas Detention Facility.

181. At all relevant times, Defendant COUNTY OF SAN DIEGO maintained and enforced policies, practices, and customs that resulted in unsafe, unsanitary, and dangerous conditions of confinement that posed a substantial risk of serious harm to detainees.

182.    These policies, practices, and customs included, but were not limited to: (a) Maintaining crowded conditions that placed detainees in close proximity to one another without adequate safeguards; (b) Failing to implement adequate sanitation and hygiene protocols; (c) Failing to implement adequate infection control measures to prevent the spread of communicable disease; (d) Failing to adequately train, supervise, and discipline employees responsible for maintaining safe conditions; and (e) Failing to investigate, correct, or remediate known unsafe conditions within its facilities.

183.    Defendant was on notice of these risks through inspections, numerous other lawsuits, reports, public health crises, and prior investigations documenting deficiencies in sanitation, infection

21

**COMPLAINT**

control, and detainee safety within its facilities.

184. Additionally, San Diego County has experienced a widely documented Hepatitis A outbreak associated with unsanitary conditions affecting vulnerable populations, further demonstrating the known risks associated with inadequate sanitation and infection control.

185. Inspections of Defendant COUNTY OF SAN DIEGO's county jail facilities confirmed the existence of longstanding systemic failures, including findings that it was "doubtful if meaningful sanitation and hygiene inspections [were] occurring" and that the Sheriff's Office "fails to meet minimum environmental health and safety standards in their jail facilities." These findings further observed that "such filthy conditions" were "so obvious" that their continued existence reflected a lack of "active intervention and corrective measures."[1]

186. These findings are consistent with and corroborate the conditions to which Plaintiff was subjected, and demonstrate that such conditions were not isolated or incidental, but part of a broader pattern and practice.

187. Despite this knowledge, Defendant COUNTY OF SAN DIEGO failed to take reasonable steps to correct these conditions, demonstrating deliberate indifference to the health and safety of detainees.

188. The unsafe and inhumane conditions under which Plaintiff was confined were carried out pursuant to, and caused by, these policies, practices, and omissions.

189. Defendant COUNTY OF SAN DIEGO's policies, practices, customs, and failures to act were the moving force behind the violation of Plaintiff's constitutional rights.

190. As a direct and proximate result of these conditions, Plaintiff was exposed to a substantial risk of serious harm and suffered illness and injury requiring medical treatment.

191. Plaintiff is entitled to compensatory damages, attorneys' fees pursuant to 42 U.S.C. § 1988, and such additional relief as the Court deems just.

**COUNT 9: Violation of California Civil Code § 52.1 (Bane Act)**

---

[1] See *Filthy and Deplorable: San Diego Jails Fall Short of Minimum Health Standards, Expert Says in Lawsuit*, San Diego Union-Tribune (Jan. 13, 2025), https://www.sandiegouniontribune.com/2025/01/13/filthy-and-deplorable-san-diego-jails-fall-short-of-minimum-health-standards-expert-says-in-lawsuit/.

22

**COMPLAINT**

**(Against Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA and DOES (including DOE OFFICERS and DOE UCSD OFFICIALS))**

192.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.    Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA interfered with, and attempted to interfere with, Plaintiff's rights secured by the Constitution of the United States, including her rights under the First, Fourth, Fifth, and Fourteenth Amendments, as alleged herein by threats, intimidation, and coercion whereby Ms. Lucas has the right to be free from unlawful arrest and unconstitutional retaliation for exercise of a First Amendment right, amongst other rights.

194. Defendant REGENTS engaged in such acts by coordinating with and enlisting University police and other law enforcement agencies, including the California Highway Patrol, to effectuate the arrest of Plaintiff as part of a broader enforcement action. The use of coordinated law enforcement authority under these circumstances constituted a show of force intended to intimidate, compel compliance, and deter protected activity. Defendant REGENTS also participated in or ratified the enforcement actions taken against Plaintiff.

195. Plaintiff was subjected to this show of force despite Defendants' knowledge that she was not engaged in unlawful conduct and was present solely as a medic, reinforcing the coercive and intimidating nature of Defendant REGENTS' actions.

196.    The excessive force used during Plaintiff's arrest, including the application of overly tight zip ties despite her compliance, constituted coercive conduct and an unlawful and unwanted use of force that interfered with Plaintiff's constitutional rights.

197.    Defendant REGENTS further used coercion by subjecting Plaintiff to a disciplinary process that compelled her participation under threat of additional sanctions, including adverse findings, continued withholding of her diploma, and consequences affecting her academic standing, reputation, and professional opportunities.

198.    At the time of the disciplinary proceedings, potential criminal charges arising from the same underlying events had not been resolved and were being held in abeyance by prosecuting authorities while the University's process proceeded. Under these circumstances, Defendant REGENTS' requirement that Plaintiff participate in questioning and respond to allegations created substantial

23

**COMPLAINT**

coercive pressure on Plaintiff to provide statements despite the risk of self-incrimination.

199.    Defendant REGENTS further used coercion by conditioning the resolution of Plaintiff's academic status, including the release of her diploma, on her submission to and participation in a fundamentally deficient disciplinary process.

200.    The coercive conduct of Defendant REGENTS, including the coordinated use of law enforcement authority and the imposition of disciplinary pressure under threat of significant consequences, was independent from, and in addition to, the underlying constitutional violations, and was intended to compel compliance, suppress protected activity, and deter similar conduct by others. The coercive conduct described herein was undertaken pursuant to institutional practices governing disciplinary proceedings and was applied to Plaintiff in a manner that interfered with her constitutional rights.

201.    As a direct and proximate result of Defendant REGENTS' conduct, Plaintiff suffered physical and emotional distress, harm to her academic standing, loss of professional opportunities, and other damages.

202.    California Civil Code §43 confers a right to be secure in one's bodily integrity.

203.    By engaging in the acts alleged above, Defendants denied those rights to Plaintiff, thus giving rise to claims for damages pursuant to California Civil Code §52.1, the Bane Act.

204.    In so doing, Defendants acted with threats, intimidation and coercion. The use of law enforcement authority to effectuate an arrest can constitute threats, intimidation, or coercion.

205.    As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial.

206.    California Government Code §815.2(a) provides that "a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would apart from this action have given rise to a cause of action against the employee." Cal. Gov. Code §815.2(a). Thus, Defendant Regents are responsible for compensation for the actions of Does.

207.    Plaintiff is entitled to compensatory damages, statutory damages, attorneys' fees pursuant to California Civil Code § 52.1(h), and such additional relief as the Court deems just.

24

**COMPLAINT**

**COUNT 10: Intentional Infliction of Emotional Distress**

**(DOES (UCSD Officials) and Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA)**

208.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

209.    DOE UCSD OFFICIALS, acting within the course and scope of their employment with Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA, subjected Plaintiff to a quasi-criminal disciplinary process that was fundamentally unfair, coercive, and lacking in basic procedural protections, resulting in significant emotional and professional harm.

210.    The conduct of DOE UCSD OFFICIALS, including subjecting Plaintiff to an adversarial proceeding while denying her basic procedural protections, restricting the role of counsel, and preventing her from presenting evidence or calling witnesses, was extreme and outrageous.

211.    DOE UCSD OFFICIALS undertook this conduct intentionally, or with reckless disregard of the probability Plaintiff would suffer emotional distress.

212. The actions of DOE UCSD OFFICIALS were taken, at least in part, to deter and chill lawful activity and to make an example of Plaintiff. Plaintiff is informed and believes these Defendants acted with malice and oppression.

213.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, including anxiety, fear, and ongoing psychological harm, as well as harm to her professional opportunities and uncertainty regarding her academic future.

214.    Defendants' conduct was a substantial factor in causing Plaintiff's emotional distress.

215.    At all relevant times, DOES were employees, agents, and/or representatives of Defendant REGENTS OF THE UNIVERSITY OF CALIFORNIA and were acting within the course and scope of their employment. Defendant REGENTS is therefore liable for their conduct pursuant to California Government Code § 815.2.

216.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

217.    Plaintiff is further entitled to punitive damages against the individual DOE Defendants in an amount sufficient to punish and deter such conduct in the future.

25

**COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief against Defendants:

1.    For general, special, and compensatory damages in an amount to be determined at trial;

2.    Award statutory damages and penalties as authorized by applicable law, including but not limited to California Civil Code § 52.1;

3.    Award punitive and exemplary damages in an amount sufficient to punish and deter such conduct by the individual Defendants only, and against any Defendant against whom punitive damages are legally available;

4.    Award attorney's fees pursuant to 42 U.S.C. § 1988 and California Civil Code § 52.1(h);

5.    For costs of suit incurred herein;

6.    Award pre-judgment and post-judgment interest, as provided by law; and

7.    Order such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, pursuant to the Seventh Amendment of the U.S. Constitution and Rule 38, Federal Rules of Civil Procedure, demands a trial by jury.

Date: May 1, 2026          Respectfully Submitted,

**KYLEE BELANGER LAW CORPORATION**

By: _____
      Kylee Belanger, Esq.

**COMMUNITY ADVOCATES FOR JUST AND MORAL GOVERNANCE (MoGo)**

By: _____
      Geneviéve L. Jones-Wright, Esq., LL.M.

      Attorneys for Plaintiff
      EMILY LUCAS

26

**COMPLAINT**